UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KIMBERLY HORNBUCKLE,

        CASE NO. 04-74093

    Plaintiff,

        PAUL D. BORMAN
        UNITED STATES DISTRICT COURT

-vs-

DETROIT RECEIVING HOSPITAL
AND UNIVERSITY HEALTH
CENTER, a Michigan nonprofit
corporation.

    Defendants.
_____/

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Presently before the Court is Defendants' Motion for Summary Judgment.

**I.    BACKGROUND:**

Plaintiff Kimberly Hornbuckle has brought suit under the Family Medical Leave Act ("FMLA"). Defendants, Detroit Receiving Hospital and University Health Center, are part of the Detroit Medical Center ("DMC"). Plaintiff formerly was employed at Detroit Receiving.

Plaintiff began working as a receptionist at Detroit Receiving Hospital's dental clinic in August 2002. (Defs.' Mem. Supp. Summ. J. 1). Her supervisor was Brenda Hall. (*Id.*). In addition to Plaintiff, there was one other receptionist, Manetta McClellan. (*Id.*). On August 27, 2003, Plaintiff received a memorandum from Hall regarding errors in her work due to "carelessness," including inputting the wrong codes for patients' procedures. (Defs.' Mem. Supp. Summ. J.Ex 6; Pl.'s Dep. 25-26). Hall states in the memorandum that she was unable to

1

"advance [Plaintiff] from the basis [sic.] responsibilities because of her error rate." (*Id.*).

On September 12, 2003, Hall completed a "Discipline Record Form" which indicated that Plaintiff was to receive "documented counseling" and her first written warning. (*Id.*). In the section entitled "Summary Report," Hall remarked that "[Plaintiff] has an unsatisfactory work performance," and that Hall had started Plaintiff on a "performance improvement plan. (*Id.*). On Plaintiff's "Job Performance Evaluation Worksheet," also dated September 12, 2003, Hall checked the "needs improvement" box under the job duty entitled "patient care." (*Id.*). The worksheet explains that a rating of "needs improvement" signifies that an employee "[h]as not achieved performance expectations. Performance improvement is necessary to achieve satisfactory level." (Defs.' Mem. Supp. Summ. J. Ex 6). The worksheet also indicates that an improvement plan was to be implemented. (*Id.*).

> The Performance Improvement Plan, also issued on September 12, 2003, states:
>
> Met with Kimberly Hornbuckle today to inform her of my dissatisfaction in her job performance. After being in the position for one year, Ms. Hornbuckle has not reached the level to complete a daily folder without errors. Ms. Hornbuckle has explained to me that "there is just too much to do" in this position.
>
> The area that Ms. Hornbuckle is deficient in is the ability to complete the daily folders without errors. This is the starting position for this job. I have concentrated Ms. Hornbuckle's training on this first step. I have explained to Ms. Hornbuckle that I cannot move her into the rest of her duties until she has shown the ability to complete this first task.
>
> Ms. Hornbuckle received documented counseling on August 23, 2003. I informed Ms. Hornbuckle at that session that I would monitor her work for improvement for a period of two weeks. I also suggested to Ms. Hornbuckle that she could make an appointment with our EAP dept., if she feels that the job is becoming too stressful for her at this time.

(*Id.* at 4.). In the "Plan" portion of the document, Hall states:

> I am composing a "cheat sheet" for Ms. Hornbuckle that will include the steps

> necessary to achieve the goal of producing an "error-free" daily folder.
>
> I will monitor Ms. Hornbuckle's work for accuracy for a two-week period. At the end of the two weeks if Ms. Hornbuckle follows the "cheatsheet" [sic.] there should be an improvement.
>
> I am allowing a 45 day window of opportunity for Ms. Hornbuckle to have an acceptable job performance rating. The next performance evaluation will be scheduled for November 3, 2003.

(*Id.*). After this evaluation, Plaintiff did not receive a pay raise, which made her upset. (Pl.'s Dep. 33).

In late December 2003, Plaintiff took a two week vacation and returned to work on January 5, 2004. (Defs.' Mem. Supp. Summ. J. Ex. A, tab 5, at 11). On January 6, 2004, Plaintiff met again with Hall, who completed a second Job Performance Evaluation Worksheet in which she indicated that Plaintiff's "[error rate ha[d] not been reduced to meet performance expectations. (Defs.' Mem. Supp. Summ. J.Ex. A, tab 7 at 1). Plaintiff believed that the errors were due to problems with the computer system that would not save changes she had made. (Pl.'s Dep. 38). Hall also completed a Discipline Record Form on January 6, 2004, in which she stated that Plaintiff's work was "unsatisfactory." (*Id.* at 2). Hall also notes that during the meeting with Plaintiff, she stated that Hall was picking on her and that she wanted to be transferred out. (*Id.*). In another memorandum, also dated January 6, 2004, Hall states that she would be "monitoring [Plaintiff's] work for the next thirty days and meet with her on Fridays at 2:30 [p.m.] to discuss any concerns." (Defs.' Mem. Supp. Summ. J. Ex. A, tab 7, at 3). While Hall testified in her deposition that Plaintiff stormed out of the office (Hall Dep. 18), Plaintiff states that Hall raised her voice at her (Pl.'s Dep. 37), and that she felt she needed to leave work. (Pl.'s Resp. 1).

### A.     Plaintiff's Visits to Dr. White

On January 7, 2004, Plaintiff left work early, stating that she was not feeling well, and asked Hall if she could leave. (Pl.'s Dep. 41). After she left work, Plaintiff visited Dr. Jacob White, Hornbuckle's longtime physician and family friend, to discuss the stress that she had been under at work. (*Id.* at 43; Pl.'s Resp. 1). Dr. White is a general surgeon, contrary to the allegations in Plaintiff's Complaint, page 2 ¶ 3, that he was a treating psychiatrist. (Pl.'s Resp. 2). Following Plaintiff's consultation with Dr. White, he issued a letter on January 9, 2004, which stated:

> To Whom it May Concern:
>
> This certifies that Ms. Hornbuckle has been evaluated by me and, appears to be a victim of Personality Disintegration Historically, this condition appears to be work related.
>
> In view of the aforementioned, I'm recommending total abstinence from all employment duties until further advised.

(Defs.' Mem. Supp. Summ. J. Ex. C, tab 4, at 14). Based on that letter and documentation provided by Dr. White to DMC, alleging stress and anxiety, Hornbuckle was placed on FMLA leave. (Pl.'s Resp. 2). Defendant DMC accepted as valid any physician certification in support of Plaintiff's entitlement to classify her absence under FMLA leave. (*Id.*). Dr. White wrote another note, also dated January 9, 2004, which stated his recommendation that Plaintiff abstain from all employment duties effective that date, resuming her regular duties on approximately February 25, 2004. (Defs.' Mem. Supp. Summ. J. Ex. C, tab 4, at 13). On February 23, 2004, Dr. White issued another letter stating that Plaintiff would not be able to perform any employment duties until March 22, 2004. (*Id.* at 17).

### C.     Plaintiff's Termination

On March 22, 2004, Plaintiff did not call or report to work, nor did she return on the following two days nor, nor did she produce any medical letter at that time. (Defs.' Mem. Supp. Summ. J. 3). Plaintiff states that Dr. White diagnosed her with anxiety, and placed her on a drug called Librium for that disorder as well as nervousness. (Pl.'s Dep. 63, 67). Plaintiff contends that she called into DMC on March 22, 2004 and spoke with Hall. (Pl.'s Resp. 3; Pl.'s Dep. 55-56). She stated that she told Hall that her doctor wanted her to continue abstaining from her work duties and that Plaintiff would be faxing a letter to Hall "as usual." (*Id.*). Plaintiff also stated several times later in her deposition that this conversation took place a few days before she was scheduled to return to work, around March 20, 2004. (Pl.'s Dep. 60, 61; 70-71). According to Plaintiff, Hall indicated to her that there would be no problem with Plaintiff just faxing the letter as soon as possible. (Pl.'s Resp. 3; Pl.'s Dep. 55-56). Before Plaintiff sent the letter, however, she received a letter in the mail from Hall, dated March 24, 2004, stating that she had been terminated effective March 26, 2004 for exceeding the three days "no call/no show" violations. (Defs.' Mem. Supp. Summ. J. Ex. A, tab 12 at 1; Pl.'s Dep. 55-56).

Plaintiff stated in her deposition that the did call Hall on or about March 22. (Pl.'s Dep. 71-72). Plaintiff produced no documentary evidence to support this claim, nor did she exercise her right to internally appeal her discharge, the procedure for which was set forth in her termination letter. (Defs.' Mem. Supp. Summ. J. 3; Def's Mem. Supp. Summ. J. Ex. A, tab 12). After her discharge, Plaintiff sent DMC a note from Dr. White, dated April 1, 2004, which stated:

> To Whom It May Concern:
>
> This certifies that during the month of March, 2004, Ms. Hornbuckle was under my care and declared Physically unfit for all employment duties.

5

> Officially, March 22, 2004 Ms. Hornbuckle remained under my care and had not been released to resume any employment duties.

(Defs.' Mem. Supp. Summ. J. Ex. A, tab 11).  Nevertheless, Plaintiff testified that she had not seen Dr. White since picking up the first letter on February 23, 2004 (Pl.'s Dep. 59-60), while Dr. White states that the last date Plaintiff stopped seeing him on a regular basis was on March 11, 2004. (White Dep. 85).  At any rate, it is clear that she had not seen Dr. White within eleven days of her termination, and was not under any type of psychiatric treatment.

### D. Plaintiff's worker's compensation and disability claims

In early 2004, Plaintiff filed a claim for workers' compensation.  (Decl. of Johnson, Defs.' Mem. Supp. Summ. J. Ex. D ¶ 8).  DMC contested the claim and arranged for an independent medical exam with psychiatrist Michael Freedman in February, 2004.  (*Id.*).  Dr. Freedman issued a written report finding that Plaintiff was not suffering from any mental illness and that she was capable of returning to work without restriction.  (Decl. of Freedman, Ex. E, ¶ 5; Ex. E, tab 2).

Plaintiff filed a short-term disability claim, which an employee is permitted to do when DMC contests a worker's compensation claim.  This claim was denied by DMC's disability insurer.  (Decl. of Johnson, Defs.' Mem. Supp. Summ. J. Ex. D ¶ 9).

## II. ARGUMENTS

### A. Defendants' Arguments

Defendant argues that Plaintiff never suffered from a "serious health condition" and was not suffering from one at the time she was discharged.  Defendant states that Plaintiff elected not

to engage a psychiatrist and that the only proof of her alleged condition comes from Plaintiff or her general physician, Dr. White. (Defs.' Mem. Supp. Summ. J. 7).  Defendant contends that Plaintiff acknowledged that the stress and anxiety that she experienced "went away after a few days," (Pl.'s Dep. 73-74), and that she was able to perform all of her daily activities without interference.  (*Id.* at 46).   Furthermore, Defendant states that the independent medical exam done by psychiatrist Dr. Michael Freedman confirmed that Plaintiff was not suffering from a serious health condition.  (Defs.' Mem. Supp. Summ. J. 8-9).  Defendant alleges that Plaintiff never mentioned any mental health problems to Dr. Freedman, and that she admitted that Dr. Freedman was the first mental health physician she had seen.  (*Id.* at 9).

Defendant also argues that Plaintiff herself corroborated Dr. Freedman's report when she stated in her deposition that Dr. White never recommended that she see another doctor, nor did he ever set up a treatment plan.

Finally, Defendant argues that Plaintiff did not on the date she was fired, because Plaintiff had not consulted with Dr. White at the time he issued the letter stating that she could not work for the month of March.  (*Id.* at 18-19).  Defendant further states that Dr. White's note, dated April 1, 2004, retroactively excusing Plaintiff from work for the month of March, fails as a matter of law to satisfy the FMLA. (*Id.* at 20-21).

The Court finds that, taking the evidence in the light most favorable to Plaintiff, the non-moving party, Defendants's Motion for Summary Judgment will be granted.

### III.    ANALYSIS

####    A.    Standard of Review

The Court reviews Plaintiffs' Motion for Summary Judgment under Federal Rule of

Civil Procedure 56.  Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. P. 56(b).  Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id*. at 323; *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

    A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties."  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted).  A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial.  *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993).  In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party.  *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-1211 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see also Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

**B.     Claim Under the FMLA**

        **1.     Applicable Law**

To establish a prima facie case of an FMLA violation, a plaintiff must prove that: (1) she is an eligible employee, as defined in 29 U.S.C. § 2611(2); (2) defendant is an employer, as defined in 29 U.S.C. § 2611(4); (3) she was entitled to take leave for one of the reasons set forth in the FMLA under 29 U.S.C. § 2612(a)(1); (4) she gave notice of her intention to take leave, as required by 29 C.F.R. §§ 825.302-.303; and (5) defendant denied her benefits to which she was entitled under the FMLA. *Cavin v. Honda of Am. Mfg.*, 346 F.3d 713, 719 (6th Cir. 2003).

The FMLA enables eligible employees to take a leave of absence "because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the

9

FMLA]." 29 U.S.C. § 2615(a)(1).  "[T]he term 'serious health condition' means an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical facility; or (B) continuing treatment by a health care provider." The Department of Labor has promulgated several regulations for the FMLA, which should be given deference under the *Chevron* doctrine.  *See Chevron v. Natural Resources Defense Counsel, Inc.*, 467 U.S. 837, 844 (1984).  29 U.S.C. § 2611(11). 29 C.F.R. § 825.114, entitled "What is a 'serious health condition' entitling an employee to FMLA leave?" states, in pertinent part:

> (a) For purposes of FMLA, "serious health condition" entitling an employee to FMLA leave means an illness, injury, impairment, or physical or mental condition that involves:
>
>> (1) Inpatient care (i.e. , an overnight stay) in a hospital, hospice, or residential medical care facility, including any period of incapacity (for purposes of this section, defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom), or any subsequent treatment in connection with such inpatient care; or
>>
>> (2) Continuing treatment by a health care provider. A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:
>>> (i) A period of incapacity (i.e. , inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
>>>
>>>> (A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g. , physical therapist) under orders of, or on referral by, a health care provider; or

> (B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

29 CFR § 825.114.  Regarding the term "continued treatment," the rule states:

> (b) Treatment for purposes of paragraph (a) of this section includes (but is not limited to) examinations to determine if a serious health condition exists and evaluations of the condition. Treatment does not include routine physical examinations, eye examinations, or dental examinations. Under paragraph (a)(2)(i)(B), a regimen of continuing treatment includes, for example, a course of prescription medication (e.g. , an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition (e.g. , oxygen). A regimen of continuing treatment that includes the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider, is not, by itself, sufficient to constitute a regimen of continuing treatment for purposes of FMLA leave.

*Id.* (emphasis added). Regarding qualifying conditions, the regulation states:

> (c) Conditions for which cosmetic treatments are administered (such as most treatments for acne or plastic surgery) are not "serious health conditions" unless inpatient hospital care is required or unless complications develop. Ordinarily, unless complications arise, the common cold, the flu, ear aches, upset stomach, minor ulcers, headaches other than migraine, routine dental or orthodontia problems, periodontal disease, etc., are examples of conditions that do not meet the definition of a serious health condition and do not qualify for FMLA leave. Restorative dental or plastic surgery after an injury or removal of cancerous growths are serious health conditions provided all the other conditions of this regulation are met.

*Id.*

        **2.**    **Discussion**

The Court finds that Defendants are entitled to summary judgment on Plaintiff's claim because it is not a question of fact whether she suffered from a serious health condition.  To be sufficient under the FMLA, the Court must determine whether she had a "serious health condition" as that term is defined in the Department of Labor's regulations. As a preliminary

11

matter, Plaintiff did not have a serious health condition under 29 C.F.R. § 825.114(a)(1) because she was never in inpatient care, nor did she receive continuing treatment by a health care provider.

Under 29 C.F.R. § 825.114(a)(2), the Court finds that Plaintiff did not have a serious health condition. The regulation states that a serious health problem must comprise "continuing treatment," including a period of incapacity, i.e., the inability to "work . . . or perform other regular daily activities due to the serious health condition." 29 C.F.R. § 825.114(a)(2). The regulations also require a treatment regimen, which may include a course of prescription medication. *See id.* at § 825.114(b).

Based upon Plaintiff's deposition, the deposition of Dr. White, and the findings of Dr. Freedman, the Court finds, taking the evidence in the light most favorable to the non-moving party, that Plaintiff did not suffer from a serious health condition. Plaintiff testified in her deposition that many of the symptoms that she was suffering from on January 9, 2004 persisted only a short time:

> Q: You just told Mr. Lipsey that on January 9th you told Dr. White you had some crying; is that right?
> A:  And nervous spells, yes.
>
> Q: Did the crying go away in a few days?
>
> A: Yes.
>
> . . .
>
> Q: Okay. And you had some nervousness, some shaking, was that also something that went away after a few days you were off work?
>
> A: Yes.

(Pl.'s Dep. 73-74). Plaintiff also stated that she was able to perform all of her usual functions

12

while she was on leave, including looking for another job:

> Q: When you were off work from January to March 2004, what did you do during the day for the most part?
>
> A: Looking for jobs. House cleaning.
>
> Q: Cooking?
>
> A: Cooking.
>
> Q: Cooking, yes?
>
> A: Yes. I was active at my daughter's school.
>
> Q: Was your appetite all right at that time?
>
> A: Yes.
>
> Q: And sleeping?
>
> A: A little restless, but I slept.
>
> Q: Any other problems that kept you from doing things you wanted to do like go to your daughter's school, and so forth?
>
> A: No.

(*Id.* at 65-66). Furthermore, Dr. White testified that he had diagnosed Plaintiff with "personality dissociation," (White Dep. at 51), although he also admitted that he did not and had never treated a serious mental condition:

> Q: What type of mental illnesses do you treat at the current time?
>
> . . .
>
> A: . . . I don't treat any mental conditions now.
>
> . . .
>
> A: No I do not treat any mental conditions.

13

> . . .
>
> Q: When is the last time you treated a serious mental condition?
>
> A: I have never treated a serious mental condition.

(*Id.* at 19-20). Dr. White also stated that he told Plaintiff to seek the advice of a mental health professional, but she declined to do so:

> A: . . . I didn't profess to be a psychiatrist at all. I'm a man that's well trained with good common sense, and I know how to execute it. I'm not in the profession to be a psychiatrist. If you note in my records, I referred her to a psychiatrist because I've dealt with these type of problems enough over the years to recognize the handwriting on the wall.
>
> And when I recognize the handwriting on the wall, I acquiesce to it. And that's what I was doing with her. No more, no less.
>
> . . .
>
> Q: You did refer her to another doctor?
>
> A: I told her, but I did it very diplomatically. I told her to find her a psychologist, which she never did.
>
> Q: And why is that?
>
> A: Because she chose not to.
>
> . . .
>
> Q: Did you prescribe a treatment plan for Ms. Hornbuckle?
>
> A: Did I? No, I did not.
>
> . . .
>
> Q: Did you talk about her seeing a psychiatrist on January 26?
>
> A: Of course I did.
>
> Q: What did she say?
>
> A: I'm going to do it. I said it's very important, very important that you get in to see

> the psychiatrist.
>
> . . .
>
> Q: Why did she stop seeing you on March 11?
>
> A: I guess because she chose to.
>
> Q: Did you suggest that she needed to come back to you?
>
> A: No, I suggested that she needed to see the psychiatrist/
>
> Q: Which she did not?
>
> A: She did not deny it; in fact, she said that she was/
>
> Q: You had nothing else – you had no further treatment for her or purpose in seeing her after March 11?
>
> A: I had no additional treatment for her.
>
> Q: After March 11?
>
> A: I do not get into real psychiatric disorders, so usually when it reaches that point, I refer them, make sure they are into the area of that specialty.

(*Id.* at 55, 57, 80, 85-86).

During Plaintiff's examination by Dr. Freedman on February 23, 2004, the same day that she met with Dr. White, Plaintiff never mentioned any problems to Dr. Freedman and stated that she felt fine.

> Q: . . . you said at one time you had some shaking problems when having the dispute with Ms. Brenda Hall. I take it you weren't shaking in [Dr. Freedman's] office?
>
> A: No. I mean I was a little nervous, but I was basically fine.
>
> Q: Okay. You didn't have pains or that sort of thing when you were in with Dr. Freedman?
>
> A: No.
>
> Q: Okay. And was that about the same when you met with Dr. White that same day?

      A:    Yes.

(Pl.'s Dep. 55). Moreover, Dr. Freedman indicated that there is no such psychiatric illness as "personality disintegration," another diagnosis made by Dr. White. (Freedman Decl., Def.'s Mem. Supp. Summ. J. Ex. E, ¶ 7-8).

Apart from the Court's finding that Plaintiff was not suffering from a serious health condition, the Court also finds that Plaintiff was not under continuing treatment on the day that she was scheduled to return to work. Dr. White confirmed that he did not put Plaintiff on a treatment plan. (White Dep. 57).

The Court reiterates that Dr. White specifically stated that he had advised Plaintiff to consult a mental health physician on numerous occasions but that Plaintiff never did. (*Id.* at 55; 80, 85). Dr. White also testified that the last time that he saw Plaintiff was on March 11, 2004, and he agreed that he had not provided any additional treatment for Plaintiff after March 11, 2004. Therefore, irrespective of the April 1, 2004 letter sent by Dr. White, Plaintiff was not under the treatment of health care provider and thus did not suffer from a serious medical condition at the time she was absent from work and terminated in late March. Accordingly, Plaintiff cannot state a valid claim under the FMLA.

## IV.   CONCLUSION

For the reasons stated above, the Court GRANTS Defendants' Motion for Summary Judgment.

**SO ORDERED.**

                                                s/Paul D. Borman
                                                PAUL D. BORMAN

                                              UNITED STATES DISTRICT JUDGE

Dated:  November 8, 2005

                                              CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on November 8, 2005.

                                              s/Jonie Parker
                                              Case Manager